# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **GERALD BROWN** | * | **CIVIL ACTION NO. 09-0048** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Gerald Brown, born August 18, 1950, filed an application for a period of disability and disability insurance benefits on January 8, 2007, alleging disability since January 5, 1987, due to post-traumatic stress disorder, chronic lumbar spine pain and left leg pain, and a lazy right eye.[1]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

---

[1] Claimant was insured for disability benefits through March 31, 1992. Thus, he must establish disability on or prior to that date. (Tr. 7).

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:[2]

**(1) Records from Lafayette General Medical Center dated October 1, 1986 to January 7, 1999.** On October 1, 1986, claimant was seen for a high pressure hose injury at work. (Tr. 124-25). He sustained multiple lacerations, avulsions, and contusions of the anterior thorax, left hand, and left lower extremity. (Tr. 126). He was admitted for debridement.

**(2) Report from M. Douglas de Mahy, Ph.D., dated January 7, 1999.** Dr. de Mahy treated claimant for about 15 months in individual and group psychotherapy. (Tr. 138). He reported that claimant was active and in the therapeutic process. His diagnosis was post-traumatic stress disorder secondary to traumatic experiences in Vietnam, and recurrent major depression. Claimant's Global Assessment of Functioning ("GAF") score was 40.

**(3) Records from Veterans Administration, Little Rock dated November 29, 2001 to February 8, 2002.** On December 16, 2001, claimant was admitted for post-traumatic stress disorder. (Tr. 141). He related his PTSD to traumatic experiences to combat in Vietnam. (Tr. 142). He had a history of

---

[2]The undersigned notes that the administrative transcript contain random, incomplete reports from J.D. Cole, Ph.D. and Dr. Daniel C. Dunlap, which were apparently considered by Disability Determination Services. (Tr. 127-136).

alcohol and marijuana abuse, and smoking two and a half packs of cigarettes per day for 30 years. (Tr. 144).

Claimant was discharged on January 25, 2002, with diagnoses of PTSD, chronic; alcohol abuse, by history; hypertension, on no medications; generalized degenerative disc disease; coronary artery disease without angina; nicotine dependence, and status-post left leg injury. (Tr. 141). His GAF score was 45.

**(4) Records from VA Medical Center, Alexandria, dated September 4, 1997 to November 30, 2006**. On September 4, 1997, claimant was diagnosed with prolonged post-traumatic stress disorder.[3] (Tr. 322). He was also seen for cardiovascular disease and osteoarthritis on December 1, 1997, essential hypertension on June 4, 1998, tobacco use disorder on June 26, 2000, and unspecified alcohol dependence on July 13, 2000.

On September 7, 2004, claimant was diagnosed with PTSD related to his Vietnam experience. (Tr. 279). Notes in the file indicated that he had been seen on June 24, 1997, by Dr. Dennis BeShara, who assessed him with a GAF of 55 because of depressed mood, occasional suicidal ideation, and paranoia, and diagnosed him with depressive disorder, NOS; anxiety disorder, NOS, and

---

[3]These records consist of a summary of claimant's problems without any supporting documentation.

polysubstance dependence. (Tr. 247). Also in the record was a note by Dr. David Daniel, a clinical psychologist at the VA hospital in Alexandria, on October 2, 1998, indicating an impression of history of depression, NOS; anxiety, NOS, rule out psychosis and rule out polysubstance dependence. (Tr. 246). Another letter reviewed from VA psychologist John W. Boyette indicated that claimant was overall unemployable and eligible for nonservice-connected disabilities. (Tr. 247).[4]

Other records in the file included a Chemical Dependency Clinic progress note from 1996 indicating that claimant had requested treatment for alcohol addiction, and recommending that claimant be evaluated by psychiatry services for reported depressed moods and PTSD. (Tr. 237). He was referred for inpatient treatment in Biloxi, Mississippi on February 6, 1997. (Tr. 182).

At the exam on September 7, 2004, the psychologist had some skepticism about claimant's case because of his mixed diagnosis, including substance abuse, PTSD, the likelihood of personality disorder, and a very exaggerated profile on the MMPI. (Tr. 279). The diagnosis was PTSD by history, alcohol and marijuana

---

[4]The record also contains incomplete records from Dr. J. D. Cole dated 1988-89, Dr. Ray C. Boyer dated February 7, 1989, and Dr. Daniel Dunlap dated November 9, 1987. (Tr. 128-30, 131, 134-36).

4

dependency, average intellectual functioning, and personality disorder, not otherwise specified. (Tr. 279-80). Claimant's GAF score was 50. (Tr. 280).

On February 25, 2005, claimant was seen for his monthly PTSD support group. (Tr. 314). He seemed to be functioning quite well. His estimated GAF was 65.

On March 21, 2005, claimant was evaluated for PTSD. (Tr. 257). He also had a severe bilateral sensorineural hearing loss. (Tr. 311). His assessment was continuing post-traumatic stress disorder and alcohol dependence in remission. (Tr. 259). His GAF score was 35.

On June 22, 2005, claimant was not markedly depressed or anxious, and was sleeping okay. (Tr. 301). His GAF score was 70. (Tr. 303).

On January 27, 2006, claimant reported that he was not having any special problems with his activities of daily living or his PTSD. (Tr. 298-99). He was not using any drugs or alcohol. (Tr. 299). His GAF score was 65.

Claimant complained of lower leg/thigh pain on February 9, 2006. (Tr. 296). The assessment was left lower extremity pain. He was prescribed Naprosyn.

On May 26, 2006, claimant appeared to be functioning quite well, but remained a tad tangential at times. (Tr. 294). He was not depressed or anxious.

His GAF was 70.

On August 10, 2006, claimant reported that his lower left leg still hurt a little occasionally, but was not as painful as on his last visit. (Tr. 347). He was not taking his Depakote as prescribed. He was cooperative, coherent, not psychotic, had no violent ideas and had clear sensorium.

On November 30, 2006, claimant appeared to be functioning well, and was not hyper, anxious, or depressed. (Tr. 344). He reported that his medications helped him rest and stay calm. His diagnosis was PTSD/100% SC, schizoaffective, unspecified, alcohol dependency, and personality disorder. (Tr. 343-44). His GAF was 70. (Tr. 344).

**(5) Records from VA Rating Decision dated March 2, 2006**. Claimant's post-traumatic stress disorder, which was 30% disabling at that time, was increased to 100% effective March 8, 1999. (Tr. 387). This was a full grant of benefits. His bilateral hearing loss was increased to 30% effective October 4, 2004.

**(6) Physical RFC ("RFC")Assessment**. There was insufficient evidence to make an evaluation. (Tr. 400).

**(7) Psychiatric Review Technique dated March 15, 2007**. Joseph Tramontana, Ph.D., determined that there was insufficient evidence to make an

evaluation.  (Tr. 401).

**(8) Records from VA Medical Center dated April 11, 2007**.  Claimant requested refills for Naproxen, Hydroxyzine, Divalproex, Sertraline, and Omeprazole.  (Tr. 416).

**(9) Consultative Examination by Dr. David Greenway dated July 22, 2008**.  At the mental status evaluation, claimant had no indication of psychotic symptoms.  (Tr. 423).  He had no loosening of associations.  There was no evidence of a formal thought disorder.  His receptive skills were good.

Claimant's insight and judgment were somewhat limited.  His social skills were adequate.  (Tr. 424).  He was alert and oriented.  Attention and concentration were within normal limits.  Recent and remote memories were intact.  Behavioral pace and effort were fair.  Response latency was normal.  Persistence at evaluative tasks was adequate.

Administration of the WAIS-III revealed a verbal IQ score of 74, performance score of 71, and full scale IQ of 73, which fell within the borderline range of intellectual functioning.  Claimant's diagnosis was PTSD per patient's reported history and mild psychosocial problems.  His GAF score was 65.

Dr. Greenway determined that claimant's adaptive skills appeared to be higher than his estimated IQ of 73.  (Tr. 425).  He opined that claimant was able to

understand, remember, and carry out fairly detailed instructions, and to maintain attention to perform simple repetitive tasks for two-hour blocks of time.  He stated that claimant should be able to tolerate the stress associated with simple work demands.  He noted that, barring physical problems, claimant should be able to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek.  His social skills were adequate such that he should be able to relate to others, including supervisors and co-workers, in employment settings.  He was considered capable of managing his own personal financial affairs.

In the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Greenway found that claimant had no mental limitations.  (Tr. 419-21).

**(10) Consultative Examination by Dr. Stephanie Abron dated July 25, 2008**.  Claimant presented with a history of back and leg pain and depression.  (Tr. 428).  He reported having a numbing-type sensation in the thigh area.  He also had a history of hypertension.  His medications included Sertraline, Amethazol, Naproxyn, Nisoldipine, and Mirtazapine.  (Tr. 429).

On examination, claimant's blood pressure was 150/90.  He could not see out of the right eye.

Neurologically, cranial nerves were intact. (Tr. 430). Reflexes were 2+ throughout. Claimant had decreased sensation to light touch in the left anterior thigh area.

Motor strength was 5/5 in the upper and lower extremities, except the left lower extremity, which was 4/5. Claimant had an antalgic gait favoring the left lower extremity, and walked with a cane. Range of motion was within normal limits, except for the left hip.

X-rays of the thoracic spine showed some slight decrease in disc height and space consistent with degenerative joint disease. The left femur showed osteophyte formation from previous injury and surgery.

Dr. Abron's impression was chronic lumbar spine and left leg pain, secondary to the injury with subsequent surgery in the 1980s. He opined that claimant needed a cane to ambulate. Claimant also presented with PTSD/depression, which was to be followed at the VA Hospital.

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Abron opined that claimant could lift/carry up to 10 pounds occasionally. (Tr. 432). He could sit, stand, and walk for three hours without interruption in an eight-hour workday. (Tr. 433). He was able to use his hands

and right foot frequently, and left foot occasionally. (Tr. 434). He could perform all postural activities occasionally. (Tr. 435).

Claimant could be around unprotected heights and moving mechanical parts occasionally, and the remaining environmental factors frequently. (Tr. 436). He could tolerate loud noise. He could not ambulate without using a cane, walk a block at a reasonable pace on rough or uneven surfaces, or climb a few steps at a reasonable pace with the use of a single hand rail. (Tr. 437).

**(11) Claimant's Administrative Hearing Testimony**. At the hearing on June 9, 2008, claimant was unrepresented. The ALJ commenced the hearing as follows:

> ALJ: Mr. Brown, I wrote you a letter and told you that you could have a lawyer present, there's not one here. If you want time to get a lawyer, there's free lawyers in here in this area, Kadian [Acadiana] Legal Services. Would you like to postpone to get a lawyer or would you like to go ahead?
>
> CLMT: I want to go ahead.
>
> ALJ: You want to go ahead?
>
> CLMT: Right.

(Tr. 16). The hearing commenced at 3:00 p.m., and ended at 3:12 p.m. (Tr. 16, 25). The transcript testimony was 10 pages long. (Tr. 16-25).

By letter dated April 17, 2007, claimant was notified by the Social Security Administration that he had the right to be represented by an attorney or other person. (Tr. 38). Attached to the letter was a list of organizations providing legal services. (Tr. 40-41). On June 9, 2008, claimant signed a Waiver of Representation by the Claimant prior to the hearing. (Tr. 44). He also signed a Waiver by Claimant to Provisions of Privacy Act of 1974 Pertaining to Evidence Received Subsequent to the Hearing on June 9, 2008. (Tr. 45).

Claimant testified that he had 11 ½ years of education, and had finished his GED in the service.[5] (Tr. 17). He stated that he could not concentrate due to pain. (Tr. 18). He also complained that he lost balance in his leg. Additionally, he complained of high blood pressure, left hand numbness, loss of balance in his left leg, blurred vision, and hearing problems. (Tr. 22-23).

Claimant stated that he was receiving $2,000 per month from the Veteran's Administration. (Tr. 19). He reported that he could bathe and dress himself and

---

[5] The Work History Report indicates that claimant had past work experience as a rigger and laborer. (Tr. 84-91).

drive. (Tr. 19-20). He said that he seldom grocery shopped. (Tr. 20). He took out small trash bags.

Regarding restrictions, claimant testified that he could sit for about 15 minutes before having pain. He said that he could stand for about three minutes. He stated that he could not walk very far, and had to use a cane. (Tr. 21). Additionally, he could bend, but not for very long.

As to medications, claimant testified that he was taking Alprazolam for his stomach, Mirtazapine for nightmares and sleeping, and Naproxen for back and leg pain.

**(12) The ALJ's Findings**. Claimant argues that the ALJ erred in failing to properly develop the record in light of his unrepresented status, resulting in a decision that was unsupported by substantial evidence. Because I find that the ALJ failed to fully and fairly develop the record, I recommend that this case be **REMANDED** for further proceedings.

Claimant asserts that the ALJ failed to develop the record in light of his unrepresented status. [rec. doc. 8, p. 2]. It is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). When a claimant is not represented by counsel, the ALJ owes

a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id*. (*citing Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). However, to merit reversal of the ALJ's decision, a claimant who does not validly waive his right to counsel must prove that he was thereby prejudiced. *Id*.; *Gullett v. Chater*, 973 F.Supp. 614, 621 (E.D. Texas 1997).

The Commissioner argues that claimant's waiver was valid because he was fully informed of his right to counsel and had received written notice of his right to representation. [rec. doc. 9, p. 3]. The record reflects that the SSA did notify claimant of his right to counsel in writing and that claimant did sign a waiver of representation. (Tr. 38, 40-41, 44). However, the ALJ did not adequately advise him of his right to counsel orally at the hearing.

In support of claimant's argument that the ALJ failed to fully advise him of the right to counsel, he cites *Gullet*, *supra*, in which the court stated as follows:

> To ensure valid waiver of counsel, the ALJ must notify the social security claimant of the following: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation of attorney fees to twenty-five percent of past due benefits and the required court approval of the fees. *Clark v. Schweiker,* 652 F.2d 399, 403 (5th Cir.1981); *see also Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994); *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir.1991).

\*\*\*

13

> Furthermore, notice should generally be provided in writing prior to a hearing. The ALJ should then provide oral notification at the hearing to "ensure[ ] that a claimant who appears *pro se* at a hearing has been made aware of the options for obtaining counsel so that her or his waiver is knowingly and intelligently effected." [*Frank v. Chater*, 924 F.Supp. 416 (E.D. N.Y. 1996)] at 425. The ALJ should also inquire as to whether the claimant had a meaningful opportunity to secure counsel and, if not, consider adjourning the hearing to provide that opportunity. *Id.* at 426.

*Id*. at 620-21. *See also*, HALLEX I-2-65-2 (A), which provides as follows:

> The ALJ will open the hearing with a brief statement explaining how the hearing will be conducted, the procedural history of the case, and the issues involved. In supplemental hearings, the ALJ need only identify the case, state the purpose of the supplemental hearing, and describe the issue(s) to be decided.
> Generally, the content and format of the opening statement are within the discretion of the ALJ. However, if the claimant is unrepresented, the ALJ must ensure that the claimant is capable of making an informed choice about representation. For example, the ALJ should ask an unrepresented claimant the following questions on the record:
> 1. Did you receive the hearing acknowledgment letter and its enclosure(s)? (If not, the ALJ will provide the claimant with a copy and the opportunity to read the letter.)
> 2. Do you understand the information contained in that letter concerning representation? (If not, the ALJ will explain the claimant's options regarding representation, as outlined in the acknowledgment letter. Specifically, the ALJ will explain the availability of both free legal services and contingency representation as well as access to organizations that assist individuals in obtaining representation.
>
> ***
>
> Once the ALJ has determined that the claimant is capable of making an informed choice, he or she will secure, on the record, the claimant's decision concerning representation. The ALJ will also

14

>enter into the record the acknowledgment letter and enclosure(s) sent to an unrepresented claimant only if the claimant elects to proceed pro se at the time of the hearing.

The record reflects that the ALJ failed to adequately advise claimant of his right to counsel at the hearing. None of the guidelines cited in *Gullet* and HALLEX were followed by the ALJ. In fact, the transcript shows that the hearing lasted only 12 minutes, and the transcript is a mere 10 pages long. (Tr. 16-25). Additionally, the ALJ summarized claimant's right to representation in a single paragraph. (Tr. 16). Thus, the undersigned finds that claimant did not validly waive his right to counsel.

However, the claimant must, in addition, show that he was prejudiced as a result of a scanty hearing. *Kane*, 731 F.2d at 1219; *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir. 2000).

In support of his argument that he was prejudiced, claimant asserts that the ALJ failed to have a vocational expert at the hearing, failed summarize the content of his off-the-record discussion, and failed to develop the incomplete records. [rec. doc. 8, pp. 6-7]. As to the last assertion, he argues that the ALJ's failure to

properly develop the record resulted in an RFC that was unsupported, as he failed to properly consider all of claimant's medically-determined impairments during the pertinent time period, which was prior to his date last insured in 1992.

The record reflects that there are incomplete records which discuss claimant's condition prior to his date last insured. It seems entirely plausible that had the record been fully and fairly developed, claimant might have been able to adduce evidence that might have effected the outcome of this case. A notice of Action of Appeals Council dated October 6, 1988 (Tr. 127, 132-33) indicates that claimant filed a prior application for social security benefits. Attached to this page is an Explanation of Determination indicating that records from J. D. Cole, Ph.D. received January 3, 1989, Lafayette General Medical Center dated October 1, 1986 through October 28, 1996, a report from the New Orleans VA Hospital received January 9, 1989, a consultative examination from Dr. Ray Boyer dated February 1, 1989, and a consultative examination by Dr. Fred Webre dated March 15, 1989, were considered by the Social Security Administration. (Tr. 133). However, only part of these records is in the current transcript. (Tr. 124-27, 128-30, 131, 134-35, 136).

Additionally, earlier reports in the record indicate that claimant had a long history of PTSD relating to his combat experiences in Viet Nam. On September 4,

1997, the VA hospital diagnosed claimant with prolonged post-traumatic stress disorder.[6] (Tr. 322). A report from M. Douglas D. de Mahy, Ph.D., dated January 7, 1999, indicates that claimant had PTSD and recurrent major depression, with a GAF score of 40. (Tr. 138). The VA also referenced a letter from psychologist John W. Boyette indicating that claimant was overall unemployable and eligible for nonservice-connected disabilities. (Tr. 247). Further, in both the Physical RFC Assessment and the Psychiatric Review Technique, there was insufficient evidence to make an evaluation. (Tr. 400-01). Because the medical records are incomplete, it is difficult to assess claimant's mental status prior to 1992.

    As set forth in § 12.00(D)(2), proper evaluation of claimant's mental impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. "Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity." *Id*. Given the medical reports and claimant's mental health history, the ALJ should have inquired further into the existence or non-existence of claimant's disability. Thus, I find that

---

[6] These records consist of a summary of all of claimant's problems without any supporting documentation.

claimant has shown prejudice due to the ALJ's failure to fully and fairly develop the record.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to obtain an opinion from Dr. J. D. Cole, Dr. Daniel Dunlap, and/or the psychologists from the Veteran's Administration, including Dr. John W. Boyette and Dr. David C. Daniel, as to the extent of claimant's impairments on or before March 31, 1992.  Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk

of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed February 24, 2010, at Lafayette, Louisiana.

*/s/ C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE